Howard E. **FERGUS**, Plaintiff,

v.

**STANDARD INSURANCE COMPANY,**
an Oregon Corporation,
Defendant.

**Civil No. 97–1644–KI.**

United States District Court,
D. Oregon.

Sept. 1, 1998.

---

Priscilla M. Taylor, Lake Oswego, Oregon, for plaintiff.

Lori R. Metz, Katherine S. Somervell, Bullivant, Houser, Bailey, Portland, Oregon, for defendant.

## OPINION

KING, District Judge.

This action arose when defendant Standard Insurance Company denied plaintiff Howard Fergus's claim under a long-term disability policy. Fergus alleges claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Before the court is defendant's motion for summary judgment (# 12) and plaintiff's cross motion for summary judgment (# 32). For the reasons below, I grant defendant's motion and deny plaintiff's motion.

## UNDISPUTED FACTS

Howard Fergus worked as an employee benefits specialist at Lattice Semiconductor Corporation from January 1994 until June 21, 1996, when he took a medical leave of absence. He was a participant in a group long-term disability plan (the Policy) issued by Standard to Lattice for coverage of its employees. The Policy states:

> During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your own occupation.
>
> You are Disabled from your own occupation if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the material duties of your own occupation.

Somervell Affidavit, Ex. A at 8. The Benefit Waiting Period is 180 days, during which time the claimant must be continuously disabled.

Fergus had open heart bypass surgery in November 1987.

On June 26, 1996, Fergus submitted a claim for long-term disability benefits for a "worsening heart condition seriously impacted by stress & other risk factors." Rec. at 415. Fergus explained that his illness prevented him from working at his occupation because the "[t]ype and amount of work produces stress and anxiety resulting in heart skipping & pain." Rec. at 416. One of Fergus's attending physicians, Dr. Henry Grass, a psychiatrist, stated on the claim form that Fergus was diagnosed with dysthymic disorder, anxiety disorder, and adjustment reaction to job-related stress. He stated that Fergus should not return to Lattice or human relations or personnel work. Rec. at 419.

On August 19, 1996, Dr. Mark Hattenhauer, Fergus's treating cardiologist, stated that Fergus "definitely feels better, has less tightness in his chest, still has an occasional skip. Otherwise, cardiac view system is negative." Rec. at 371. He also noted that Fergus's cardiac status is stable but that work can aggravate his cardiac situation. On August 20, 1996, Dr. Hattenhauer wrote a letter supporting a job change for Fergus to allow him to work on goals, such as exercise, diet, and weight loss, which he needed to accomplish to improve his cardiac prognosis. "With this current job situation, I believe, this is impossible, because of the stress. I would recommend that he change his occupation, from being involved in human resource management, to something entirely different, something that would be far less stressful." Rec. at 361.

On December 5, 1996, Dr. Hattenhauer completed an attending physicians statement for Standard in which he noted that he recommended to Fergus in August 1996 that he stop working because it may contribute to his coronary artery disease. Rec. at 313.

On January 31, 1997, Standard denied Fergus's claim because it concluded that he was not disabled through the 180 day Benefit Waiting Period.

There are indications that your medical condition caused you to cease work on June 21, 1996. However, two weeks after being off work, you were considerably improved, and by August 12, 1996, you were described as being uncharacteristically relaxed. There are also no other clinical findings that would support significant impairments from a physical or mental aspect that would prevent you from performing the material duties of your own occupation after August 12, 1996.

Rec. at 339.

On February 27, 1997, Sheila Smith, a social worker treating Fergus, stated that he had been unable to perform the duties of his position of employee benefits specialist since June 1996 and that he should not return to Lattice or any other employer in that occupation at any time in the future.

On March 18, 1997, Fergus appealed the decision through his attorney and requested all information that related to or was considered by Standard in processing the claim thus far. Rec. at 301. On March 31, 1997, Standard provided all of the documents then existing except for a report by Dr. Brad Fancher, a medical consultant for Standard, dated January 17, 1997. In this report, Dr. Fancher stated:

> It was reasonable that the claimant cease work on June 21, 1996. However, two weeks after being off work, the claimant was considerably improved and by August 12, 1996 he was described as being uncharacteristically relaxed. I believe the claimant could have returned to his usual position without limitations or restrictions by August 12, 1996. While I am in agreement with the claimant's cardiologist and his psychiatrist that a lifestyle change and different occupation might be beneficial for the claimant, I cannot see any medical or physical cause of impairment which would have prevented him from returning to his former occupation on August 12, 1996.

Rec. at 344.

On April 8, 1997, Dr. Fancher wrote a second report in which he clarified that he believed Fergus needed some time off beginning June 21, 1996, due to his psychological problems and not his cardiac disease. Dr. Fancher thought that by August 12, 1996, Fergus could have returned to work without limitations in regard to his psychological condition. Rec. at 293. In summary, Dr. Fancher agreed that Fergus might well benefit from a change of occupation but that he is not specifically impaired or disabled from doing his usual occupation for a different employer.

On April 16, 1997, Standard affirmed its decision that Fergus is not disabled under the Policy. Standard concluded that there is no evidence that Fergus could not work for a different employer in the same general occupation. Standard referred the claim to its Quality Assurance Unit. Rec. at 290.

On June 12, 1997, Fergus's attorney wrote Standard stating that she had not received requested information regarding the medical consultants' review of the claim. Rec. at 271. On June 19, 1997, Standard informed Fergus that it was returning his claim to the Benefits Department for further investigation. Standard also sent Fergus the missing report from Dr. Fancher dated January 17, 1997, and a new report from him dated April 8, 1997.

On July 16, 1997, Dr. Grass sent a letter to Standard stating, "It is extremely clear to me that he [Fergus] cannot return to the corporate environment without grave danger to his health." Rec. at 127.

On August 25, 1997, Dr. Toenniessen, a psychiatrist acting as a medical consultant for Standard, reviewed Fergus's claim. He concluded that Dr. Grass' recommendation that Fergus change occupations was not out of medical necessity but was to accommodate a less stressful lifestyle. He agreed with Dr. Fancher that Fergus would probably benefit from an occupational change but that there were no clinical findings to support psychiatric restrictions from his own occupation. Rec. at 116.

On August 27, 1996, Dr. Grass wrote in chart notes:

> I agreed with his social worker and cardiologist that it was not in Mr. Fergus' best interest to his [sic] current employer or to be involved in the future in human

relations work. I recommended long-term disability from that position and consideration of eventually retraining for some alternate profession if he can get control of his cardiac disease.

Rec. at 397.

On August 17, 1997, Dr. Daniel Gottlieb, an independent cardiologist retained by Standard, reviewed Fergus's medical records and concluded:

Certainly, particularly with appropriate treatment, [Fergus] should have been capable of any sedentary position, particularly one that did not cause extreme emotional stress.

Rec. at 97. On September 28, 1997, Dr. Gottlieb wrote an update clarifying his opinion of Fergus's ability to work in June 1996. He stated:

Therefore, I agree with you that the claimant could have worked in a sedentary job without any restriction from ordinary occupational stressors in June 1996. In April 1997, with progression in his symptomatology, diagnostic testing, and anatomical findings, he still should have been able to work in a sedentary job; however, I agree he should have been shielded from severe emotional stress which could result in ischemia. Therefore, in June 1996, the claimant could have returned to his usual stressful occupation considering cardiac factors alone. Even if one assumes the most extreme of emotional stress, given the presumed mild nature of his coronary disease at that time, treatment with a nitroglycerine or possibly mild prophylactic antianginal treatment with a calcium channel blocker or beta blocker should have been easily employed to prevent any conceivable ischemia.

Rec. at 76–77. Fergus did not make any requests for documents on which Standard was basing its decisions at any time after Dr. Gottlieb wrote his two opinions. Standard did not supply his two opinions to Fergus until March 1998, during the production of documents in this action.

Fergus filed this action against Standard on October 6, 1997. On October 22, 1997, Standard denied Fergus's claim for the third time. Rec. at 64.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *T.W. Elec. Serv., v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

## DISCUSSION

I. *Denial of a Full and Fair Review of the Claim*

Fergus contends that Standard denied him his statutory right to a full and fair review of the denial of his claim: (1) by failing to promptly provide the January 17, 1997, report by Dr. Fancher; and (2) by failing to provide the reports by Dr. Gottlieb until this action was filed.

ERISA provides that every employee benefit plan shall:

afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133(2). The requirement is clarified in regulations:

Every such [review] procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may:

(i) Request a review upon written application to the plan;

(ii) Review pertinent documents; and

(iii) Submit issues and comments in writing.

29 C.F.R. § 2560.503–1(g)(1). Courts have interpreted the core requirements of a full and fair review to include knowing the evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider evidence from both parties before reaching a decision. *Grossmuller v. International Union,* 715 F.2d 853, 858 n. 5 (3rd Cir.1983).

■ Standard issued its first denial of Fergus's claim on January 31, 1997. On March 31, 1997, it responded to his request for pertinent documents by sending all of the documents except the January 17, 1997, report from Dr. Fancher. On April 16, 1997, Standard affirmed its denial of the claim and forwarded the decision to its Quality Assurance division for review. Standard asked Fergus to submit any additional information by June 13, 1997. On June 19, 1997, Standard sent the January 17, 1997, report from Dr. Fancher to Fergus, along with a April 7, 1997, report from Dr. Fancher written after Fergus's request for documents. On that date, Standard also told Fergus that the Quality Assurance Unit asked for additional reviews of the claim to be made by a cardiologist and psychiatrist. The denial after those additional reviews did not occur until October 22, 1997. Consequently, Fergus had several months in which to review and comment on the reports by Dr. Fancher. This is true even though Standard had asked for all additional information to be submitted six days before it provided the Dr. Fancher reports. There is nothing in the record to indicate that Standard would not have accepted comments on those reports while it was waiting for the cardiology and psychiatry reviews. Fergus was not denied a full and fair review in conjunction with the late production of Dr. Fancher's first report.

Dr. Gottlieb's reports, written on August 17, 1998, and September 28, 1998, were not relied upon by Standard until it denied the claim on October 22 and turned the claim over for a second review by the Quality Assurance Unit. Fergus was not entitled to the reports until that date. By then, however, Fergus had chosen to file this case rather than to continue pursuing the administrative process. He was not denied a full and fair review of his claim in conjunction with the Dr. Gottlieb reports.

Standard's motion for summary judgment against claim two, failure to provide a full and fair review, is granted and Fergus's motion is denied.

## II. *Failure to Respond to Written Request for Documentation*

■ In his third claim, Fergus alleges Standard violated of 29 U.S.C. §§ 1024(b)(4) and 1132(c) when it failed to provide the reports by Dr. Fancher and Dr. Gottlieb in response to a written request for documentation.

Section 1024(b)(4) states:

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

By its terms, this section of ERISA does not apply to documents regarding a particular claim. Accordingly, Standard did not violate this section concerning these doctors' reports.

Section 1132(c)(1) states:

Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal....

■ Lattice is the plan administrator, not Standard. To remedy this problem, Fergus asks for permission to join Lattice as a defendant liable under this section of the statute. Joinder of Lattice, however, would be futile.

The Third Circuit held that plan administrators incur no personal liability under § 1132(c) for failure to fulfill obligations imposed by 29 C.F.R. § 2560.503–1(g). *Groves*

*v. Modified Retirement Plan,* 803 F.2d 109, 116 (3rd Cir.1986). The court based its holding on the fact that "plan administrators," who may be personally liable under § 1132(c), are different entities from "plans," upon which the cited regulation places the obligation to provide documents. *Id.* I agree with this reasoning, as have other Circuits. *See Stuhlreyer v. Armco, Inc.,* 12 F.3d 75, 79 (6th Cir.1993); *Wilczynski v. Lumbermens Mutual Casualty Co.,* 93 F.3d 397, 406 (7th Cir.1996). Therefore, Lattice, as plan administrator, would not be liable under § 1132(c) for failure to provide documents pertinent to denial of a claim. Standard, as claims administrator, is not liable under § 1132(c), which applies to plan administrators.

Standard's motion for summary judgment against claim three is granted and Fergus's motion is denied.

### III. *Denial of Disability Benefits*

 Fergus contends that Standard's decision denying his disability claim should be overturned as an abuse of discretion.

A denial of ERISA benefits is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the benefit plan gives the administrator such authority, the appropriate standard of review is abuse of discretion.

*Parker v. BankAmerica Corp.,* 50 F.3d 757, 763 (9th Cir.1995) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If there is an apparent conflict of interest, the court reviews a denial of benefits under a heightened level of scrutiny.[1] *Id.* An abuse of discretion[2] occurs if decisions are rendered

without any explanation, provisions of the plan are construed in a way that conflicts with the plain language, or decisions rely on clearly erroneous findings of fact. *Taft v. Equitable Life Assurance Society,* 9 F.3d 1469, 1472–73 (9th Cir.1993). Decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion. *Id.* at 1473.

██ The Policy states:

Except for those functions which the Group Policy specifically reserves to the Policy owner, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

Our authority includes, but is not limited to:

1. The right to resolve all matters when a review has been requested;

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The right to determine:

a. Eligibility for insurance;

b. Entitlement to benefits;

c. Amount of benefits payable;

d. Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

Somervell Affidavit, Ex. A at 16. Standard has reserved sufficient authority for an abuse

---

**1.** In *Palmer v. University Medical Group,* 973 F.Supp. 1179 (D.Or.1997), Magistrate Judge Jelderks provided a thorough analysis of the split within the Ninth Circuit concerning the appropriate inquiry when there is a possible conflict of interest. A recent case attempting to resolve the issue was withdrawn pending rehearing by the *en banc* court, *Kearney v. Standard Ins. Co.,* 144 F.3d 597 (9th Cir.), *op. withdrawn and reh'g en banc granted* (Aug. 3, 1998). Until there is further guidance from the Ninth Circuit, I generally agree with Magistrate Judge Jelderks' conclusion that in a benefits determination case, the court

should acknowledge that in some situations there is an inherent conflict of interest. If such a conflict of interest appears to be present, the court's review is more searching depending on the severity of the conflict. *Id.* at 1189. This is the analysis followed in *Parker.*

**2.** The use of the terms "arbitrary and capricious" versus "abuse of discretion" is a "distinction without a difference." *Taft,* 9 F.3d at 1471 n. 2 (quotation omitted).

of discretion standard to apply under *Firestone Tire.* There is an apparent conflict of interest in that Standard both determines if benefits should be paid under the Policy and funds any benefits that are awarded. Thus, I will apply a heightened level of scrutiny.

■ The doctors were in general agreement that Fergus should not return to his position at Lattice. Fergus's three treating medical professionals, his cardiologist, psychiatrist, and social worker, all agree that Fergus could not return to his occupation of employee benefits specialist at any other company. There is evidence that the position at Lattice was highly stressful due to a high turnover rate for employees, excessive amounts of work requiring up to 70 hours per week, and an abusive and demeaning superior who was impossible to satisfy. Fergus's treating medical professionals all believed that the occupation of employee benefits specialist was inherently stressful enough, even at companies other than Lattice, that Fergus could not perform the job without endangering his health and that he needed to change occupations.

■ Balancing this evidence are the opinions of nontreating, nonexamining physicians who reviewed Fergus's medical records. A general medical consultant, a cardiologist, and a psychiatrist all concluded that Fergus should not return to Lattice but that he could work in the occupation of employee benefit specialist at another company. Standard chose to rely on these medical opinions rather than on the opinions of Fergus's treating medical professionals. Accepting the opinion of the insurance company's medical consultant over the opinion of the treating physician is not clearly erroneous. *Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 482 (9th Cir.1990). Although the doctors disagree with each other, there is nothing in the record on which I could conclude that the medical opinions on which Standard chose to rely were clearly erroneous.

In making its decision, Standard did not have to construe any language that has caused a dispute.

Standard denied Fergus's claim three times. In doing so, it obtained two additional reviews from doctors specializing in Fergus's impairments, cardiology and psychiatry. Standard gave reasons for each denial. In the first denial, Standard concluded from chart notes that Fergus's psychological condition had improved by August 12, 1996, and that there were no clinical findings that would prevent him from returning to his occupation by that day. In the second denial, Standard explained: (1) there is no consensus in the medical community regarding the relationship of stress and coronary artery disease; (2) the medical data does not indicate the necessity to be away from the occupation more than two or three months; and (3) employment at Lattice may have caused transient mental limitations but there is no evidence that working for a different employer in the same general occupation would reasonably cause major limitations from either coronary artery disease or a mental disorder lasting longer than 180 days. In the third denial, Standard explains: (1) from a cardiac perspective, Fergus could have returned to work in his own occupation before the end of the Benefit Waiting Period on December 18, 1996, even though he experienced significant cardiac distress in April 1997; and (2) from a psychiatric perspective, Fergus experienced periodic episodes of compulsivity, anxiety and panic from December 1995 through June 1996 with significant improvement by August 1996, thus not suffering a continuous period of major mental restrictions through the Benefit Waiting Period. These explanations provide detail well beyond the lack of reasons typical when discretion is abused.

■ Fergus also argues that the procedural defects were so severe that the denial of the claim is an abuse of discretion as a matter of law and the court should require that benefits be awarded.

Substantive remedies are not available for procedural defects unless "continuing procedural violations result in substantive harm, then a court must consider [such violations] in determining whether the decision to deny benefits in a particular case was arbitrary and capricious." *McKenzie v. General Telephone Co. of California,* 41 F.3d 1310, 1315

(9th Cir.1994) (quotation omitted), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995). *See Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353–54 (9th Cir.1984) (procedural violations were one factor in determining that a denial of benefits was arbitrary and capricious for a secret separation policy that had no summary plan description, no claims procedure, and no provision to inform participants in writing of anything), *cert. denied,* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985).

As discussed in the analysis of the full and fair review claim, no harm occurred by the timing of the release of the doctors' reports. Fergus had several months to respond to Dr. Fancher's reports while Standard did further investigation. Fergus filed this action in state court before Standard denied the claim based in part on Dr. Gottlieb's reports. Any procedural violation was minimal compared to the defects in *Blau* and do not indicate that there was an abuse of discretion.

Standard was faced with conflicting medical opinions. I conclude that it did not abuse its discretion in agreeing with the opinions that Fergus was not continuously disabled from his occupation during the entire Benefits Waiting Period and consequently, not entitled to benefits under the Policy. Decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion. *Taft,* 9 F.3d at 1473. The abuse of discretion standard does not allow overturning a decision if there is relevant evidence that "reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 332 (9th Cir.1996) (quotation omitted). Here, Standard relied on the opinions of three doctors in denying the claim. That is adequate to support its decision, even though there were conflicting opinions in the record. Standard's motion for summary judgment against the first claim is granted and Fergus's motion is denied.

## CONCLUSION

Defendant's motion for summary judgment (# 12) is granted against all claims. Plaintiff's cross motion for summary judgment (# 32) is denied.